UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                                          Case No. 26-CR-

WILLIAM C. ADAMS,
a.k.a. "BILL BILL,"

Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, Erica J. Lounsberry and William Berens, Assistant United States Attorneys, and the defendant, William C. Adams, individually and by attorney Michael Hart, pursuant to Rule 11of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

## CHARGES

2.      The defendant has been charged in a single count information, which alleges a violation of Title 18, United States Code, Sections 1591(a)(1) and 1591(b)(1).

3.      The defendant has read and fully understands the charge contained in the information. He fully understands the nature and elements of the crime with which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to waive prosecution by indictment in open court.

5.      The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

**THE UNITED STATES CHARGES THAT:**

*Beginning in approximately August 2009, and continuing through approximately January 2025, in the State and Eastern District of Wisconsin, the State and District of North Dakota, the State and District of Wyoming, the State and District of Nebraska, the State and District of Minnesota, the State and District of Colorado, the State and Northern District of Texas, the State and Northern District of Illinois, the State and Southern District of Florida, and elsewhere,*

**WILLIAM C. ADAMS, a.k.a. "BILL BILL,"**

*in and affecting interstate commerce, did knowingly recruit, entice, harbor, transport, provide, obtain and maintain by any means AV-1, AV-2, AV-3, AV-4, AV-5, and AV-6 knowing and in reckless disregard of the fact that means of force, threats of force, fraud, and coercion, and any combination of such means, would be used to cause AV-1, AV-2, AV-3, AV-4, AV-5, and AV-6 to engage in commercial sex acts.*

*In violation of Title 18, United States Code, Sections 1591(a)(1) and 1591(b)(1).*

6.      The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 5. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that the facts in Attachment A are true and correct and establish his guilt beyond a reasonable doubt. The information in Attachment A is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

2

## PENALTIES

7.      The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries a minimum mandatory penalty of 15 years in prison up to a maximum of life in prison, five years to life on supervised release, and a mandatory $100 special assessment. The parties further recognize that, pursuant to Title 18, United States Code, Section 1593, that restitution in the full amount of the victim's losses, as determined by the court, is mandatory for the offense to which the defendant is pleading guilty. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 30 of this agreement.

8.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9.      The parties understand and agree that in order to sustain the charge of sex trafficking by force, fraud, or coercion as set forth in the information, the government must prove each of the following propositions beyond a reasonable doubt:

First, the defendant knowingly recruited, enticed, harbored, transported, provided, obtained the victims identified in the information;

Second, the defendant knew that force, threats of force, fraud, or coercion would be used to cause the victims identified in the information to engage in a commercial sex act; and

Third, the offense was in or affecting interstate or foreign commerce.

## SENTENCING PROVISIONS

10.      The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

3

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 5. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating

4

the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## Base Offense Level

16. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the Information is 34 under Sentencing Guidelines Manual § 2G1.1(a)(1).

## Multiple Victims

17. The parties agree to recommend that, pursuant to Sentencing Guidelines Manual §§ 2G1.1(d)(1) and 3D1.4, a five-level increase applies based on the number of victims involved in the offense charged in the Information.

## Role in the Offense

18. The parties agree to recommend that the sentencing court apply a four-level increase for an aggravating role as an organizer or leader in the offense, pursuant to Sentencing Guideline Manual § 3B1.1(c).

## Obstruction

19. The parties understand that the government will recommend that the sentencing court apply a two-level increase for attempted obstruction with respect to the investigation of the offense of conviction, pursuant to Sentencing Guideline Manual § 3C1.1. The parties further understand that the defendant will not join in this recommendation.

## Acceptance of Responsibility

20. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), and to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b), but only if the defendant exhibits conduct consistent with those provisions.

## Sentencing Recommendations

21.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

22.     Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the sentencing guideline range; the fine to be imposed; the amount of restitution and the terms and condition of its payment; the defendant's custodial status pending the sentencing; and any other matters not specifically addressed by this agreement.

23.     Because of the timeliness of the defendant's plea, and the government resources saved by its entry prior to indictment, the parties agree to jointly recommend a sentence of the mandatory minimum term of 15 years in prison followed by 5 years of supervised release.

## Court's Determinations at Sentencing

24.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 7 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

25. The parties acknowledge, understand, and agree that the defendant may not move to withdraw his guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

26. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

27. The defendant agrees to provide to the Financial Litigation Program (FLP) of the United States Attorney's Office, upon request of the FLP during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLP and any documentation required by the form. The defendant further agrees, upon request of FLP whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the defendant has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition. The defendant expressly authorizes the United States to obtain the defendant's credit report at any time.

### Fine

28. The parties agree to recommend that no fine be imposed against the defendant, to prioritize repayment of restitution to the victims identified in the Information.

7

## Special Assessment

29.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

30.     The defendant agrees that all properties listed in the Information constitute the proceeds of the offense to which he is pleading guilty or were used to facilitate such offense. The defendant agrees to the forfeiture of these properties and to the immediate entry of a preliminary order of forfeiture. The defendant agrees that he has an interest in each of the listed properties. The parties acknowledge and understand that the government reserves the right to proceed against assets not identified in this agreement.

## Restitution

31.     The defendant understands that because restitution for the offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S WAIVER OF RIGHTS

32.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights, which include the following:

    a.    If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

    b.    If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual

8

bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.   If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.   At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.   At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

33.   The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

34.   The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

9

35.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

36.     Based on the government's concessions in this agreement, the defendant knowingly and voluntarily waives his right to appeal his conviction or sentence in this case and further waives his right to challenge his conviction or sentence in any post-conviction proceeding, including but not limited to a motion pursuant to 28 U.S.C. § 2255. As used in this paragraph, the term "sentence" means any term of imprisonment, term of supervised release, term of probation, supervised release condition, fine, forfeiture order, and restitution order. The defendant's waiver of appeal and post-conviction challenges includes the waiver of any claim that (1) the statutes or Sentencing Guidelines under which the defendant is convicted or sentenced are unconstitutional, and (2) the conduct to which the defendant has admitted does not fall within the scope of the statutes or Sentencing Guidelines. This waiver does not extend to an appeal or post-conviction motion based on (1) any punishment in excess of the statutory maximum, (2) the sentencing court's reliance on any constitutionally impermissible factor, such as race, religion, or sex, (3) ineffective assistance of counsel in connection with the negotiation of the plea agreement or sentencing, or (4) a claim that the plea agreement was entered involuntarily.

**Further Civil or Administrative Action**

37.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any

10

other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

**<u>MISCELLANEOUS MATTERS</u>**

38. Pursuant to 18 U.S.C. § 3583(d), the defendant has been advised and understands the court shall order as a mandatory condition of supervised release, that the defendant comply with state sex offender registration requirements. The defendant also has been advised and understands that under the Sex Offender Registration and Notification Act, a federal law, he must register and keep the registration current in each of the following jurisdictions: the location of his residence; the location of his employment; and, if he is a student, the location of his school. Registration will require that the defendant provide information that includes, name, residence address, and the names and addresses of any places at which he will be an employee or a student. The defendant understands that he must update his registration not later than three business days after any change of name, residence, employment, or student status. The defendant understands that failure to comply with these obligations may subject him to prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine and/or imprisonment.

39. In connection with the defendant's plea of guilty, the defendant, in consultation with counsel, has chosen not to request discovery materials pursuant to Fed. R. Crim. P. 16 ("Rule 16 Material"). The defendant understands that if not for entering this plea of guilty, the government would have been required to produce Rule 16 Material, and would further have been required to produce material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963) and Fed R. Crim. P. 5(f), and, if the defendant had proceeded to trial, impeachment material pursuant to

11

*Giglio v. United States*, 405 U.S. 150 (1972), and Jencks Act material. The defendant acknowledges that the defendant has not received, and will not receive, such information because the defendant has decided to plead guilty. The defendant waives his right to this information and agrees not to withdraw his plea or to attack his conviction or sentence, either on direct appeal or collaterally, on the ground that the government has failed to produce any such information, apart from any information establishing the factual innocence of the defendant.

## GENERAL MATTERS

40.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

41.     The parties acknowledge, understand, and agree that the United States Attorney's Office is free to notify any local, state, or federal agency of the defendant's conviction.

42.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### Further Action by Internal Revenue Service

43.     Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the information.

44. The defendant agrees to transmit his original records, or copies thereof, to the Examination Division of the Internal Revenue Service so that the Examination Division of the Internal Revenue Service can complete its civil audit of the defendant. The defendant agrees to provide any additional books and records of his which may be helpful to the Examination Division of the Internal Revenue Service to complete its civil audit of defendant.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

45. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

46. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor

13

agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney, and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 3/22/2026

WILLIAM C. ADAMS
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: March 22, 2026

MICHAEL F. HART
Attorney for Defendant

For the United States of America:

Date: 3/23/26

ERICA J. LOUNSBERRY
WILLIAM T. BERENS
Assistant United States Attorneys

14

**ATTACHMENT A**

The evidence collected during the course of the investigation of this case proves that William C. Adams has been involved in trafficking women for commercial sex, including the victims identified as AV-1, AV-2, AV-3, AV-4, AV-5, and AV-6 in the Information, since at least 2009. Had this case proceeded to trial, the victims and other witnesses would have testified to the following facts set forth below. The defendant admits that the government could have proven his guilt beyond a reasonable doubt at trial. Specifically:

Evidence collected from interviews, surveillance, forensic imaging of cell phones, social media, and other sources shows that Adams recruited women and girls in Milwaukee, Wisconsin, and elsewhere with promises of a romantic relationship and material wealth, and by showing them luxury goods he has accumulated from his years of pimping, such as custom cars, designer clothing, and gold and diamond jewelry. Adams convinced his victims that they would quickly earn enough money to meet their personal goals and to live the same luxurious lifestyle he did if they agreed to join his "escort" business—which he often falsely told his victims was legal or only based on time and companionship. He then sent them to other states, including North Dakota, South Dakota, Wyoming, Nebraska, Colorado, Texas, Minnesota, Illinois, and Florida, to dance at strip clubs and perform commercial sex acts under the supervision and direction of the women who had been working for him the longest. Adams told the women they must give him everything they earned and that he would keep it safe for them until they returned to Milwaukee for periodic breaks from doing "dates." In reality, Adams controlled all of their earnings, and his victims saw little to none of this money.

Adams' recruitment tactics were largely based on promoting a lifestyle he claimed was only attainable if his victims did exactly as he instructed. By making promises he never intended to keep, Adams manipulated women into believing they could not function without him, allowing him to keep psychological control over them for months or even years despite the geographical distance between them—which Adams used strategically to minimize his risk of detection by law enforcement.

Adams sets rules for his victims, including rules about how much money they needed to earn, when they could eat or sleep, when they could return home, how often and in what manner they needed to communicate with him, and who else they were allowed to communicate with, among others. When his victims violated these rules, or if Adams felt they were acting or speaking disrespectfully towards him, Adams put them "on punishment," which could include loss of "privileges," higher earning quotas before they could rest or return home, threats to harm them or their loved ones, and/or physical violence, such as slapping, punching, and beating with objects.

Adams self-identified as a pimp, reflected in several tattoos and custom jewelry he has referencing pimping. Adams has also openly posted on Facebook and Instagram about his pimping and the money he makes from it. The following are some examples of Adams' posts:

      a.  An Instagram post on December 8, 2014, of a meme depicting a woman handing a man a large stack of cash with the text, "REAL BITCH'S DO REAL THINGS!!!"

b. An Instagram post on January 24, 2015, of a meme reading, "Stop Being A Fag AND Do Sum Hoin'."

c. An Instagram post on September 23, 2015, featuring black and white photos of women being slapped and the text, "If ONE MORE BITCH Tells Me She's A Pimp I'm Liable to Smack Her Stupid Ass." This post was captioned, "You fake hoes can't Mash and Crash on a bitch the way I can!!!," with the hashtags, "#youhoes," "#moneymob," "#realtalk," "#reality," "#100," and "#realshit." Money Mob is a term frequently used by Milwaukee pimps to refer to their status.

d. An Instagram post on September 2, 2015, of an image with the text, "Sell more Pu$$y."

e. An Instagram post on May 31, 2015, of an image with the text, "Stop liking all my pictures hoe... and chose up!!" The image was captioned "Yeah you bitch!!!! #moneymob #whitegirls #snowbunnies #realhoesonly #richniggashit #dontmissout." "Choosing up" refers to leaving one pimp for another, and "snow bunnies" refers to white women involved in prostitution.

f. An Instagram post on October 26, 2015, with a photo depicting Adams, wearing gold chains and a Gucci hat, with his palms together, captioned "Praying to the Pimp God!!!! No more faggot ass bitches!!!! #moneymob #noexcuses #real talk."

g. An Instagram post on November 1, 2023, with a photo showing two of Adams' luxury vehicles, a Lamborghini and a Bentley. The photo had text superimposed on it that said, "Paid the cost to be the boss, paid the cost to be the boss," and "Tell ya bitch drop her head, there go bill.bill," referencing a traditional pimping rule that women involved in prostitution must lower their heads in the presence of a pimp.

The sections that follow summarize Adams' trafficking of each of the victims identified in the Information and this plea agreement.

**AV-1**

AV-1 met Adams in November 2010 when she was 18 years old and had recently run away from home. At that time, Adams had visible wealth and a glamorous lifestyle that he showed off to AV1. Adams told AV-1 that he wanted her to be his girlfriend and that he would take care of her. He told her she was pretty and that she should earn money as an exotic dancer. Adams promised AV-1 that she would quickly be able to put together money to start her business, as well as have her own place and a car.

Shortly after they met, Adams had AV-1 start dancing at the Airport Lounge in Milwaukee, followed by On the Border ("OTB") in Franklin, Wisconsin. Adams rented an apartment for AV-1 that she lived in during this time, and he also helped her to get a car, using a portion of the money she earned.

Early on, AV-1 felt uncomfortable and "gross" dancing, especially while she was on her period. Adams told her to just cut the string off her tampon and it would be okay. When AV-1 told

17

Adams a second time that she felt uncomfortable, Adams became angry and told her she had to dance no matter what. Adams would also repeat his promises that it would all be worth it in the end and that they would be rich and have businesses, cars, and a house.

While AV-1 danced, Adams would take all the money she made. Adams then decided, in his discretion, how that money was spent and how much of it would be used to pay for AV-1's bills and expenses.

In March 2011, Adams sent AV-1 to North Dakota to dance at a club in Williston, North Dakota. AV-1 stayed in a hotel in North Dakota with R.R, Adams' "bottom bitch", who trained and supervised many of his victims. As Adams' bottom, R.R. would collect money from Adams' victims, wire that money to Adams or others who collected it for him, and buy clothes, hygiene products, and food for Adams' victims.

Adams did not accompany AV-1 or his other victims when they went to North Dakota to work. Adams had AV-1 and the other victims wire him money from commercial sex dates via Walmart to Walmart using Money Gram. AV-1 also sent him cash from commercial sex dates in packages via mail. This pattern is corroborated by financial records subpoenaed from multiple banks and money wiring services.

Before AV-1 left Milwaukee, Adams set a quota for AV-1 of $1,000 per day and told her that she would have to start "seeing men" if she was not producing enough from dancing alone. After two weeks had passed, Adams called AV-1 saying she needed to start performing commercial sex acts in addition to dancing and that R.R. would teach her what to do.

Adams required AV-1 to perform commercial sex dates for his financial benefit every day while in North Dakota. AV-1 would work a nine-hour shift at the strip club from 4 p.m. until 1 a.m. After that, she needed to be available to do sex dates, which they found from posting advertisements on the former commercial sex website Backpage.com. She and the other victims were allowed to sleep only after they were done conducting sex dates and had reached Adams' quota. In the morning, AV-1 had to "work the phones," meaning setting up/scheduling sex dates again.

For about a three-year period, from 2011 to 2013, AV-1 would spend about two months in Williston, North Dakota, conducting prostitution dates before Adams would allow her a "vacation" of two weeks to one month in Milwaukee, Wisconsin. These "vacations" were the only time Adams allowed AV-1 to return home, and she was not allowed to choose to go elsewhere instead. If he felt disrespected by AV-1 or AV-1 did something that angered him, Adams would extend AV-1's stay in Williston, and she would have to work longer and earn more money for Adams before being allowed to return home. He would also threaten to take away her belongings.

While AV-1 was on her "vacation," she had to ask Adams for permission if she wanted to go places, such as running errands or meeting up with her friends and family. Adams also imposed a curfew on her, requiring her to be in her apartment by a certain time each night.

During AV-1's "vacations," Adams would come to her apartment periodically to check on her. During these visits, Adams would reward AV-1 for earning money for him by having sex with

her. Sometimes, AV-1 did not want to have sex with Adams and would tell him she was tired or had her period, but Adams would not allow AV-1 to refuse him. These encounters caused AV-1 to fear Adams and increased his control over her.

Adding to her fear was AV-1's knowledge of Adams' violence toward the other women who worked for him. For example, Adams once came to AV-1's apartment with blood on his white t-shirt. Adams told AV-1 that he had beaten R.R. saying, "I had to put my hands on her."

Adams would also directly threaten AV-1. For example, he told AV-1 that if she left him, he could pay someone to break into her apartment and "fuck [her] with a broomstick." Adams also threatened AV-1 that if she ever got a boyfriend, he would break her legs so she would never be able to dance again.

Adams was violent with AV-1 on at least one occasion, when AV-1 got into a car accident. Adams came to meet AV-1 and had her follow him to an auto body shop. AV-1 tried to explain to Adams that the crash was an accident, but Adams struck her in the head. AV-1 also recalled her having to hide from Adams in her bathroom more than once, bracing the door using her feet, with her back against the bathtub.

Other witnesses also recall hearing about or witnessing Adams' violence toward AV-1 or seeing AV-1 with bruises and scratches. One described that Adams gave AV-1 the "hot and cold treatment," which she described as being beaten with an extension cord, then put in an ice bath and that Adams had given AV-1 black eyes.

In total, AV-1 worked for Adams for approximately eight years, with periodic gaps. She danced and performed commercial sex acts, in strip clubs, bars, and online in Wisconsin, North Dakota, Iowa, Colorado, Wyoming, and Texas. After several years of leaving Adams and later returning to him, AV-1 finally broke ties with him for good in approximately June of 2019.

### AV-2

AV-2 was in a relationship with Adams in 2013 and has a child in common with him, born in 20XX. On September 1, 2013, Adams was arrested for Battery, False Imprisonment against AV-2 and for Possession of a Firearm by a Felon in Franklin, Wisconsin. During an argument about Adams "dating" other women, Adams repeatedly punched AV-2 on her arm and chest, and slapped her in her face. This caused visible injuries that were photographed, including significant bruising to AV-2's jaw and scratches on her back and legs. While AV-2 was crying and pleading with Adams to stop, Adams told her, "I'll do you like all my bitches. I'll beat you up and you can leave once the sun comes up." Adams did not let AV-2 leave his house until morning.

Adams gave consent for officers to search his residence, and officers found two firearms in the trunk of a vehicle parked in the attached garage. Additionally, officers found a pistol magazine loaded with five rounds and a loose bullet in the nightstand in the bedroom. Officers also noted homemade wooden barricades on the front door.

AV-2 disclosed that she first met Adams when she was 19 years old. AV-2 initially turned down Adams' urging that she begin stripping, however she eventually started dancing at the Crazy

19

Horse strip club in West Allis, Wisconsin. AV-2 did not know how Adams earned his money when they started dating, but after she moved in with him, she learned he was a pimp by hearing him talking on the phone. Adams also told AV-2 that he beat the females who worked for him, causing AV-2 to fear Adams.

Later in their relationship, when AV-2 and Adams would argue, Adams would tell AV-2 that she owed him money. When AV-2 told Adams she wanted to leave him, Adams claimed she had to repay him the money he had spent on her during their relationship. Adams told AV-2 that he had invested that money into her and that she could not end the relationship without paying Adams back. Initially, Adams told AV-2 that she owed him approximately $10,000 but he increased the claimed number several times until it was $100,000.

Adams sent AV-2 to Williston, North Dakota, for her to earn the money Adams said she owed him. Adams paid for AV-2's train ticket. AV-2 said she intended only to dance at a strip club, however, there were waiting lists at the clubs there, and AV-2 was unable to dance. As a result, AV-2 conducted prostitution dates instead. Adams instructed AV-2 to give all the money she earned to R.R. In roughly five days, AV-2 conducted approximately fifteen to twenty prostitution dates and made approximately $7,000 to $8,000, which she gave to R.R. at Adams' direction.

On one occasion, AV-2 had a commercial sex date with an intoxicated client who became aggressive with AV-2 and flipped the mattress. AV-2 called Adams for help, but Adams told AV-2 she was overreacting and to keep making money.

AV-2 had never conducted any prostitution dates prior to travelling to North Dakota to work for Adams. AV-2 only did the sex dates so that Adams would let her leave him.

### AV-3

AV-3 first met Adams in 2009 when she was 17 years old. Adams promised to buy her a car and get her a place of her own with furniture. Although Adams was aware of AV-3's age and that she was in high school, he began a romantic relationship with her and had her move in with him. While living with Adams, AV-3 saw him interact with R.R. AV-3 observed Adams become physically violent with R.R., so she tried to appease Adams to avoid being beaten too.

AV-3 first worked for Adams dancing and doing commercial sex dates from approximately the summer of 2009 to the fall of 2010. AV-3 began by stripping at a club near St. Louis, Missouri for a few months. While AV-3 was still 17 years old, R.R. took photos of her for use in commercial sex ads. In August 2009, she went to Sturgis, South Dakota, during the Sturgis Motorcycle Rally, where she did her first date shortly after she turned 18 years old.

Initially, R.R. collected all the money AV-3 earned after each date. Later, Adams had AV-3 deposit money into bank accounts, send money in packages, and wire the money through Western Union. The money was sent to other people to pass on, never directly to Adams. AV-3 estimated she sent money to Adams over twenty times and made "a lot" of money for Adams. AV-3 stated Adams would get angry if he did not get money from the commercial sex dates.

20

Adams would send AV-3 out of state to do commercial sex dates in Missouri and North Dakota for three to four months at a time. In between these periods, Adams would allow her to return to Milwaukee, Wisconsin, for two-week periods for "vacation." After two weeks of "vacation," Adams would send AV-3 back out of state to work for him. Adams would delay AV-3's "vacation" time if he didn't get money from her, making her stay and work one or more weeks longer than promised.

On one occasion, while she was on a break in Milwaukee, AV-3 visited a friend and didn't respond to Adams' attempts to reach her right away. When AV-3 next saw Adams, Adams was upset. He demanded to know where she had been, and he hit her. Adams then produced a taser and threatened to tase her until she told him where she had been.

This incident motivated AV-3 to keep Adams happy so he wouldn't beat her again, but AV-3 was not always able to avoid Adams' violence. When Adams wanted to get information out of AV-3, or if AV-3 told Adams she wanted to leave, he would punch her in her face or ribs and threaten to take her belongings from her. Doing dates was physically difficult for AV-3, and on one occasion, she required treatment at a hospital in Williston for vaginal pain and bleeding. In spite of this, Adams would not allow AV-3 to turn down sex dates, even when she was tired, sick, or on her period.

AV-3 left Adams the first time in the fall of 2010, after Adams stranded her and a friend in a hotel in Madison, Wisconsin. AV-3 ended up returning to Adams around the summer of 2015, after months of messages from Adams persuading her to return to him. Facebook records show that on January 29, 2014, Adams sent AV-3 a message saying, "I promise I won't try to control you I just love you so much you don't even know!" AV-3 replied, "I love being with u. I'm so happy when we're together. But u & I both knw wat it is. U want me to work for u. And believe me I would but I have to make my family proud. At the end of the day I really don't wana be a prostitute."

Despite that reply, Adams eventually convinced AV-3 to return to working for him. During this second period, AV-3 worked for Adams doing commercial sex dates for about five to six months. This time, AV-3 secretly kept some of the money she made from her sex dates. AV-3 indicated she had learned how to "play the game" and made sure she did not make Adams angry to avoid her getting beaten.

In October of 2015, Adams was hospitalized after being shot. Shortly thereafter, in early December 2015, Adams was arrested for violations of probation and incarcerated. AV-3 left Adams after the shooting and changed her phone number. Approximately one month later, AV-3's new boyfriend's car was vandalized; all the windows were smashed in, and all the tires were slashed. Adams contacted AV-3 from jail and told her that he was responsible for her boyfriend's car being vandalized.

## AV-4

AV-4 met Adams in February 2012, when she had just turned 18 years old. At the time, she had a difficult home life, and she only had food to eat when it was provided at school. Adams pulled up to her in an expensive car and began talking to her. He told her that he could offer her a better life, and that he would take care of her and teach her how to "make real money."

21

Adams told AV-4 he had females doing prostitution dates for him in North Dakota and that they were well taken care of. Adams told AV-4 that she would be able to send money to her family if she would do the same. Adams told AV-4 that he loved her and that eventually she would fall in love with him, too.

AV-4 saw that Adams had many luxury cars, including a Bentley, a Mercedes, and a pick-up truck, all of which were newer model years with custom white exteriors, red leather interiors, and white rims. He also wore expensive clothes and a gold and diamond watch. She was impressed by his wealth and believed he could improve her life as he had promised to do.

Adams sent AV-4 by train to Williston, North Dakota on February 23, 2012. Adams gave AV-4 the money for the ticket and a phone number for another woman working for him there, referred to in the criminal complaint as AV-6. Adams told AV-4 that he was a pimp, and he didn't have to leave Milwaukee because his "girls" did what he told them to do.

AV-6 set up AV-4's first prostitution date within an hour of AV-4's arrival in Williston. During her time in North Dakota, AV-4 did approximately five to ten dates each day. All the money AV-4 earned from dates was turned over to Adams, typically via Western Union, or by deposit into a bank account for Adams. Adams did not allow AV-4 to keep any of the money she made performing commercial sex acts, even to buy food or toiletries.

Adams had several rules he required AV-4 to follow, including never looking another male in the eye, never speaking to men other than Adams or their dates, and never starting romantic relationships with anyone.

Adams normally allowed AV-4 and the other women who worked with her to return home after two weeks if they "behaved." If they misbehaved, however, they would have to continue working in North Dakota. Examples of misbehaving included getting too drunk or giving Adams attitude over the phone.

Adams had originally promised AV-4 that she would only be in North Dakota for two weeks, however after she had been doing dates every day for a month, Adams punished AV-4 by making her stay even longer because he found out that AV-4 he begun a relationship with someone in North Dakota.

After approximately six weeks in Williston, AV-4 asked her brother to buy her a train ticket so she could come back to Milwaukee. Adams repeatedly called AV-4 and would show up at her family's home looking for her. Adams also contacted AV-4 via Facebook Messenger and told her to "come back to daddy." Adams promised her he wouldn't be mad if she just came back, but when AV-4 eventually returned, Adams hit her for leaving him.

Adams also hit AV-4 on at least one other occasion, when she did not answer a question quickly enough. AV-4 also saw Adams beat up other women. For example, she recalled seeing him punch AV-6 in her face when they were in the car together.

Subpoenaed Amtrak records show that AV-4 returned to North Dakota on April 21, 2012. AV-4 worked in Williston doing commercial sex dates every day for about a month at a time before coming home to Milwaukee for two weeks at a time. When Adams allowed AV-4 to return to the Milwaukee area, he had her stay at a hotel in Glendale. Adams did not allow AV-4 to leave the hotel for any reason, and she had to rely on him to stop by and provide her with food.

AV-4 left Adams in approximately May of 2013 by hiding enough money for herself to buy herself a bus ticket home. Although Adams continued to try to get her back, she refused.

### AV-5

AV-5 first met Adams while she was employed as a cocktail waitress at Silk Exotic Milwaukee Gentlemen's Club in Milwaukee, Wisconsin, in early 2015. He invited her to look him up on Instagram, where his profile name was "bill.bill." When AV-5 checked out Adams' Instagram account, she saw pictures of Adams wearing expensive clothes and posing with lots of custom cars, including an Aston Martin, all of which had white exteriors and red leather interiors.

Shortly after this, AV-5 lost her job and her car. She was also struggling to afford Adderall, which she had become addicted to as a coping mechanism for her work and childcare schedule. On March 28, 2015, AV-5 messaged Adams on Facebook telling him she was ready to start making money. Adams replied that she should call him rather than using Facebook, and they would discuss the details then.

Adams and AV-5 met in a parking lot where he had sex with her. Afterwards, Adams told AV-5 that he usually did not have sex with a woman until she worked for him. AV-5 thought the comment was strange. AV-5 asked Adams about how he could help her make money. Adams told AV-5 he owned an "escort" business and that the women who worked for him went on dates with men in other states that he lined up. Adams made it sound like these were casual dinner dates. AV-5 did not understand that Adams was talking about prostitution.

Adams told AV-5 that he would be sending her to North Dakota for two weeks at a time, and that she would earn hundreds of dollars from each date. After that, she would be able to come back to Milwaukee to be with her daughter. He told her that she would quickly earn enough to get a new car and housing for herself and her daughter.

A day or two later, Adams took AV-5 to a storage unit to show her four luxury cars, including an Aston Martin, all of which were white with red interiors. Adams told AV-5 that he had bought these vehicles with the money he made from "selling pussy."

Afterwards, AV-5 and Adams stopped at a store. AV-5 made a small purchase for herself, and Adams questioned AV-5 about having money. He told AV-5 she had to give him whatever she had. Adams made AV-5 use her debit card to withdraw $1,000 and give it to him. He then got her PIN number and used the card himself and withdrew another $200.

Shortly thereafter, Adams then took AV-5 and another woman, referred to in the criminal complaint as Adult Female 8 (AF-8), to the Amtrak station, where they boarded a train for

23

Williston, North Dakota. Subpoenaed Amtrak records show they arrived in Williston on March 30, 2015. They then joined R.R., who was already there.

AF-8 and R.R. laid out Adams' rules for how AV-5 should perform "escort" dates. These rules included that AV-5 had to turn over all the money she made to AV-8 or R.R., who would send it to Adams. If AV-5 needed money for anything, she had to request Adams' permission.

AV-5 was aware that Adams used violence against some of his victims. For example, AV-5 recalled that Adams beat up AF-8 outside of a bar and that she had a "big forehead as a result." AV-5 also recalled a time when Adams became upset with another female, referred to in the criminal complaint as Adult Female 6 (AF-6), because he did not like how she had her hair styled. Adams sent AV-5 to the store on a pretext. When AV-5 returned, Adams told AV-5, "I had to hit her. She was being so stupid."

AV-5 stated that while Adams was never violent with her, he manipulated her into performing commercial sex acts for him. AV-5 felt that she was not in control of basic decisions for herself. For example, while AV-5 was in Williston, Adams put R.R. in charge of dispensing drugs to AV-5. Adams had promised to supply AV-5 with Adderall, but when he did not have any, he told her to use cocaine that he supplied instead. Adams allowed AV-5 four Adderall pills or one gram of cocaine per day. Adams also dictated AV-5's physical appearance. He required her to wear hair extensions. He also told her that she needed to lose weight by always wearing a waist trainer except during dates and taking an appetite suppressant. Adams also expected AV-5 to always be ready to accept dates. If she was not, Adams or the woman who set up the date would yell at her.

Despite Adams' promises, Adams made AV-5 remain in Williston for more than two months. It was not until the other women working for Adams in Williston were arrested for blackmailing a john at Adams' direction in mid-June 2015 that Adams brought AV-5 back to Milwaukee.

In Milwaukee, Adams got AV-5 a hotel room, but he would not allow her to leave it. AV-5 had thought she might finally receive her portion of her earnings from Adams while in Milwaukee, but he did not give her anything. When AV-5 told Adams she wanted to go shopping, he told her, "This isn't a vacation."

Adams also had unwanted sex with AV-5. Because she was engaging in vaginal commercial sex acts with other men, Adams insisted on having anal sex with her instead, telling her, "I'm not another trick." Adams also refused to use lube and was forceful, causing AV-5 to cry.

Adams then told AV-5 she needed to go back to North Dakota with AF-6 to make money for another woman's bail. Adams said that AF-6 would be supervising AV-5 going forward. Less than a week after AV-5 had returned to Milwaukee, Adams sent AV-5 to Gilette, Wyoming, with AF-6.

While in Wyoming, AV-5 then began trying to leave Adams. One of these times, AV-5 made it to Minot, North Dakota. While she was there, Adams called AV-5 and told her that she needed to return to working for him, or he would call her mom and tell her that AV-5 was "hanging out with pimps and whores." AV-5 did not want Adams to contact her mother, so she returned.

24

Several weeks later, AV-5 began talking to another man she thought she could use to help her get out of the situation with Adams. She asked for his help in getting back to Milwaukee, and she did not have any further involvement with Adams after that.

## AV-6

AV-6 was dancing at On the Border ("OTB") in Franklin, Wisconsin, in late 2017 when a friend there introduced her to Adams. Adams tipped AV-6 $100, and AV-6 thought he seemed charming and trustworthy. AV-6 gave Adams her phone number.

AV-6 and Adams began a sexual relationship about a week later, and AV-6 thought Adams wanted to be her boyfriend. After another week, however, Adams told AV-6 that he was a pimp and that he had "hoes" working for him. Adams told AV-6 that she was going to work for him doing sex dates and that she was going to give him all of her money, and he would take care of her. Adams persuaded AV-6 that he was able to take care of her by pointing to material goods that he claimed he or the women working for him had, such as homes and cars.

AV-6 first found sex dates at OTB. She would meet them while she was dancing, and they would arrange a commercial sex date at the john's home or a hotel. Adams would also text men who had expressed an interest in AV-6, pretending to be her, to set up dates that he would drive her to. Adams required AV-6 to earn at least $500 per date and at least $1,000 per night, although AV-6 often earned closer to $2,000 for Adams in a night.

AV-6 gave Adams everything she earned, both from dancing and from the dates, in cash or via CashApp or Zelle. AV-6 could not spend any money without direct permission from Adams. Adams often denied her requests to spend money on things like clothing or food, but he typically allowed her to get her hair and nails done, as he saw her appearance as an investment. If Adams got less than $1,000 from AV-6 on any given day, he would block her from contacting him and accuse her of "stealing" from him.

Adams required AV-6 to earn him money every day of the week. She often danced at the strip club from the time it opened (often around 11 am) to the time it closed (often around 2:30 am), then performed commercial sex dates outside of the club until about 6 am, leaving her only 5 hours to rest before returning to the club. Adams forced AV-6 to work even when she was sick or uncomfortable with a particular client. He would not allow her to refuse.

On May 25, 2021, a disgruntled client shot at AV-6 inside OTB, causing AV-6 to be fired. Adams then moved AV-6 to the Chicago area and had her begin dancing in clubs there, including Polekatz, Atlantis, and Club 390, and finding dates there.

Even when Adams was not physically with AV-6 while she was working, Adams controlled her activities. He required AV-6 to share her location with him on her phone. He also frequently threatened AV-6 that if she did not do what he told her to do or go where he told her to go, he would lock her out of her apartment (as he controlled her leases), or she would walk outside to find her car gone. Adams made good on these threats numerous times. For instance, in September 2024,

25

Adams locked AV-6 out of her apartment by changing the access code because he felt she was not making him enough money.

Adams used physical violence against AV-6 on average at least once a week for things like talking back to him, using a disrespectful tone of voice, or not earning enough money. These assaults caused bruises, scratches and cuts. Adams would then buy AV-6 long-sleeved body suits to wear at the strip club so that she could continue to earn money.

On July 13, 2022, AV-6 walked into the emergency room at Glenbrook Hospital in Glenview, Illinois, to be treated for a physical assault. AV-6 was crying and told the medical providers at the hospital that her pimp had been beating her. When officers of the Glenview Police Department responded, she identified her pimp as "Bill Bill" (Adams) and said he was forcing her to engage in prostitution. AV-6 reported Adams had been texting her demanding that she earn him more money. AV-6 told law enforcement that she had taken an Uber to the hospital because she was afraid for her life and had nowhere to go. The police left Adams a voicemail telling him to leave AV-6 alone.

Following this incident, in August 2022, Adams moved to West Palm Beach, Florida. Adams then had AV-6 traveling back and forth between South Florida and Illinois, continuing to earn money for him from dancing and sex dates. In Florida, she worked out of clubs such as Tootsies, Boobie Trap, The Porthole, Gold Club, Cheetahs, and Diamond Dolls.

Adams continued to require AV-6 to earn him $1,000 a day, which became increasingly difficult for AV-6. As a result, Adams saw AV-6 less and less frequently, and he became more threatening toward her the less she earned. AV-6 tried several times to persuade Adams to let her get a "real" job instead, but Adams refused to let her, telling her, "All my hoes sell pussy."

In 2024, AV-6 began communicating sporadically with investigators who wanted to interview her about her experiences with Adams. On August 8, 2024, investigators received a phone call from AV-6 who stated that Adams had gotten upset with her on her birthday, beaten her, taken her money, and left. AV-6 stated Adams got upset because she was not making him as much money as he wanted from dancing and doing commercial sex dates, and because she had spent money on getting her hair done. AV-6 tried to tell Adams that the money she earned was hers, but Adams insisted it was his. Before Adams left, he told AV-6 he had to go talk with one of his other "hoes."

AV-6 finally cut ties with Adams in January 2025 with help from her family.

26